# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

DALE DWAYNE CRAIG        CIVIL ACTION

VERSUS

BURL CAIN, ET AL         NO. 10-766-D-M2

## NOTICE

 Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

 In accordance with 28 U.S.C. § 636(b)(1), you have 14 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 14 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

 **ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

 Signed in chambers in Baton Rouge, Louisiana, July 21, 2011.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**

DALE DWAYNE CRAIG                                          CIVIL ACTION

VERSUS

BURL CAIN, ET AL                                          NO. 10-766-D-M2

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on the Petition for Writ of Habeas Corpus (R. Doc. 1) filed by petitioner, Dale Dwayne Craig ("Craig"). The State of Louisiana ("the State") has filed an opposition (R. Doc. 15) to Craig's petition, in response to which Craig has filed a reply memorandum. (R. Doc. 19).

## FACTS & PROCEDURAL BACKGROUND

The following facts were elicited through evidence and testimony presented at the jury trial of Craig, which took place in October 1994. On the evening of September 14, 1992, Craig convinced three (3) of his friends, James "Jughead" Lavigne ("Lavigne"), Zebbie Berthelot ("Berthelot"), and Roy Maurer ("Maurer"), to help him steal a car so that he could visit his girlfriend, Nicole Yatter ("Yatter"), in Walker, Louisiana. Although they initially attempted to steal unoccupied vehicles, when they were unsuccessful, they decided that they would steal a car when someone was exiting a vehicle. At the time, Craig and Berthelot were both armed with nine-millimeter pistols. *See*, Tr. Transcript, pp. 5518-5524.

Craig and his friends found Kipp Gullet ("Gullet"), who had just returned from visiting a friend, exiting his Ford Bronco in the parking lot of Kirby Smith dormitory on LSU campus.

Yelling for his companions to get into Gullet's Bronco, Craig held his gun to Gullet's head[1] and forced him into the back of the vehicle while the others got into the vehicle, and Maurer drove them out of the parking lot. *Id.*, p. 5525. As they were driving, Craig and his friends noticed that the vehicle was low on gasoline, and they drove around searching for a gas station with few people present, ultimately stopping at a Texaco station near the corner of Government and Foster Drive for gas. *Id.*, p. 5526. While they were driving, Gullet was sitting between Craig and Lavigne in the backseat, and he was crying and pleading with his captors, offering them money and his vehicle and telling them that his parents were rich and would pay for his safe return. *Id.*, p. 5527. Gullet also attempted to keep his face hidden in his hands in an effort to convince his captors the he would not be able to identify them if they were to let him go, but Craig made him sit up straight and "look normal." Craig also taunted Gullet during the drive, asking him questions concerning "whether he would be missed or not," whether Gullet's girlfriend and parents expected a call when he returned home, and jokingly whether Gullet had "gotten any[thing]" sexually from his girlfriend that night. *Id.*, p. 5528.

The drive, in which Craig and the others debated Gullet's fate, lasted nearly an hour, during which time Gullet "cried hysterically the whole time." *Id.*, p. 5535. According to the record, Craig indicated that Gullet should be killed, while the others suggested that Gullet simply be beaten unconscious, rather than killed. Berthelot testified that he suggested just "drop[ping] the kid off," but Craig "mouthed to [him] the words, kill him. And [Berthelot] said,

---

[1] There is some dispute as to whether Craig struck Gullet in the head with his gun at this point or where he instead put the gun to Gullet's head and forced him into the back of the Bronco, as discussed below in Footnote 30.

*no, man, you can't kill this kid."  Id.*, p. 5529.

Craig and his friends ultimately drove Gullet to a secluded construction site near Kenilworth Parkway in South Baton Rouge, at which point Craig forced Gullet to get out of the vehicle at gunpoint and told Berthelot to give Lavigne the other gun.  Craig and Lavigne then marched Gullet at gunpoint approximately eighty (80) feet into the construction site. Maurer and Berthelot watched from the Bronco, and according to Berthelot's testimony, even though it was dark, he could tell the difference between Craig and Lavigne because Craig was about one (1) foot shorter than Lavigne.  *Id.*, pp. 5532, 5596-97.

Lavigne testified that, at Craig's direction, he hit Gullet across the base of the skull with the butt of his gun, knocking him to the ground.  Lavigne then began walking back toward the Bronco.  With Gullet laying on the ground in a fetal position, Craig knelt at his side and fired three bullets into his head at point-blank range.  *Id.*, pp. 5595, 5532.  Craig then stood up and shot at Gullet "a couple more time[s]."  *Id.*  Lavigne started running toward the Bronco as soon as Craig began firing, and Craig followed him to the truck as soon as he finished firing the shots.  *Id.*, p. 5595.

As they left the construction site, Craig told Maurer, "[M]an, I told you I was hard," and explained that he had to kill Gullet because Berthelot had made the mistake of mentioning Lavigne's name in Gullet's presence.  Craig told the others in a joking manner:

> You think we should go out and kill anybody else? And he
> answered his self [sic], naw, the game warden might get pissed
> off at us.  And then he made another comment about Kipp.  He
> said, you know, it's a damn shame that the boy didn't get any
> p*ssy that night before he died.

*Id.*, p. 5596, 5533.  Craig also told Berthelot, Lavigne, and Maurer that they were his "boys" and that he loved them, but "if [they said] one f*cking word about this [he'd] kill [them], too."

*Id.*, p. 5596, 5533-34.  The four then headed to Walker to visit Craig's girlfriend, Yatter; however, she had already left Walker after midnight and was waiting for Craig in Baton Rouge.

When Craig met Yatter later that morning, he told her that he had killed "a boy" that night, and he described the murder to her, telling her how he decided to kill the victim when one of the others used an identifying name.  *Id.*, p. 5412.  The following day, Craig removed the stereo system from Gullet's Bronco, and while being followed by his mother, Yatter, and Lavigne in a separate car, Craig drove the Bronco to a vacant spot along the Mississippi River levee and set fire to it.  He also married Yatter that same day.  *Id.*, p. 5412-13.

Gullet's body was discovered by police at the construction site on September 16, 1992.  Police recovered four (4) nine-millimeter shell casings near Gullet's body and two (2) of the five (5) bullets that, according to testimony, had been fired.  Subsequent forensic testing indicated that the bullets and shell casings that were recovered were fired from the same weapon.  *Id.*, p. 5513.  An autopsy of Gullet's body confirmed that the shots that were fired into his head were at a distance of one (1) foot or less.  *Id.*, p. 5559.

Within the next five (5) days, Craig, Berthelot, Lavigne, and Maurer, all of whom were teenagers ranging in age from fifteen (15) to nineteen (19) years,[2] were arrested and charged with Gullet's murder.  Lavigne, Berthelot, and Maurer provided tape-recorded confessions to police.  Craig was the only one to assert his right to counsel and refuse to speak to police.  At the time of Berthelot's arrest, police seized the nine-millimeter pistol that Lavigne used to strike Gullet.  Forensic analysis indicated that such gun was not the

---

[2] Craig was seven (7) days shy of his eighteenth birthday at the time of the murder.

one that fired any of the shell casings or bullets found at the construction site. *Id.*, p. 5513. During a search of Craig's residence, police found a car stereo, speaker wires, a spent nine-millimeter shell casing, a red gas can, and a set of keys, which were subsequently used to open Gullet's dorm room. *Id.*, 5430, 5457-58; Exhibit A to Craig's habeas petition, R. Doc. 1-1, p. 2-3.

Craig, Lavigne, Berthelot, and Maurer were indicted for capital murder. Lavigne and Berthelot agreed to testify against Craig in exchange for reduced charges, while Yatter agreed to testify against Craig in exchange for the State's promise not to prosecute her. *Id.*, p. 5408-09, 5516-18, 5592-93. Although the district attorney indicated, during opening arguments, that Maurer would also testify at trial against Craig, Maurer was never called as a witness at Craig's trial. Craig contends Maurer did not testify because he refused to testify against him.

Prior to Craig's trial, he attempted to plead guilty and proceed directly to the penalty phase of his trial. The state trial court denied that attempt because the State had not agreed to a guilty plea qualified by an agreement not to seek the death penalty, and pursuant to La. C.Cr.P. art. 557, the court therefore had no authority to accept the guilty plea. At Craig's 3-day jury trial, his counsel conceded to the jury, during opening arguments, that Craig was involved in the murder of Gullet and that he had attempted to plead guilty and to take responsibility for his actions. During the trial, Lavigne and Berthelot were the State's principal witnesses, and they provided detailed testimony describing the carjacking, kidnapping, taunting, and brutal murder of Gullet, as discussed above. Craig's wife, Yatter, waived the spousal privilege and testified that Craig admitted to her that he had murdered Gullet and had described to her how the murder occurred. The State also

presented physical evidence linking Craig to the crime that had been recovered from Craig's residence, which included the car stereo from Gullet's Bronco and Gullet's keys. Lavigne, Berthelot, and Yatter were questioned by both the prosecution and defense counsel concerning their history of drug use and whether anyone, including Craig, was using drugs or alcohol on the night of the murder. Although Lavigne and Berthelot admitted to having used and sold drugs on other occasions, they (and Yatter) denied use of alcohol or drugs on the night of the murder and denied, based upon their interactions with Craig, that he had been using drugs or alcohol on the night of the murder.

Following his jury trial, Craig was found guilty of first degree murder and unanimously sentenced to death on the basis that the murder had been committed during the course of an armed robbery and an aggravated kidnapping and because the offense had been committed in an especially heinous, atrocious, and cruel manner. The Louisiana Supreme Court affirmed Craig's conviction and sentence on May 20, 1997, and the U.S. Supreme Court denied his writ application concerning same on October 20, 1997. Since Craig was not yet eighteen (18) years of age at the time of the murder, the U.S. Supreme Court commuted his death sentence to a life sentence without parole in 2005.

On September 15, 1998 and April 21, 1999, Craig filed an original and an amended post-conviction relief application. Several of his claims were withdrawn after his death sentence was commuted to life. The claims that were ultimately considered during his post-conviction proceedings were: (1) whether his trial counsel's admissions of his guilt and failure to make any meaningful effort to oppose the State's evidence was the functional equivalent of a guilty plea and deprived him of his privilege against self-incrimination, his right to have the issue of his guilt or innocence presented to the jury as an adversarial

issue, and his right to confront his accusers in violation of the Fifth and Fourteenth Amendments to the United States Constitution, Article I, §§ 2, 13, 16 and 17 of the Louisiana Constitution, and *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709 (1969); (2) whether his trial counsel's failure to subject the State's case to any meaningful adversarial testing denied him his right to effective assistance of counsel either under the standard of *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1884) or under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984); (3) whether the State improperly withheld exculpatory evidence in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, §§2, 13, and 16 of the Louisiana Constitution and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1964); (4) whether the State knowingly used false testimony to convict him in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, §§2, 13 and 16 of the Louisiana Constitution and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173 (1959); and (5) whether the selection of his grand jury foreman pursuant to former La. C.Cr.P. art. 413(B) violated *Campbell v. Louisiana*, 523 U.S. 392 (1998), the Fourteenth and Sixth Amendments to the U.S. Constitution and Article I, §§2, 3, 15 and 16 of the Louisiana Constitution, by discriminating on the basis of race.

The State filed procedural objections to Craig's post-conviction relief application on December 2, 1998, April 28, 1999, and August 18, 1999. The state trial court heard oral argument concerning those objections on August 20, 2009, and on September 30, 2009, the state trial court dismissed all of Craig's post-conviction claims. The state trial judge sustained the State's procedural objection concerning Craig's grand jury foreman race discrimination claim, finding that Craig had waived that claim because he failed to

adequately raise it through his pre-trial motion to quash his indictment. As to Craig's

remaining post-conviction claims, the state trial judge summarily denied them pursuant to

La.C.Cr.P. art. 929(A).[3][4] *See*, R. Doc. 1-23. Craig applied for writs to the Louisiana First

---

[3] La.C.Cr.P. art. 929(A) provides that, if a state court determines that the factual and legal issues contained in a post-conviction relief application can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents submitted by either party or available to the court, the court may grant or deny relief without further proceedings. La.C.Cr.P. art. 929(A).

[4] In ruling upon Craig's remaining post-conviction claims, the state trial judge did not discuss each claim independently; rather, she denied those remaining claims on the merits for the following reasons:

> [The Court]: In the court's analysis, even if every allegation made in your application for post-conviction relief is found to be true, even if the jury did not hear information about the drug use, even if the defense attorney didn't vigorously contest the fact that Mr. Craig was a participant and not a main actor, at the end of the day[,] even if Mr. Craig got a hearing on all of those issues[,] the outcome would still be the same. Mr. Craig has already received[,] by virtue of the Supreme Court's ruling disqualifying him for eligibility for the death penalty[,] he has received every relief that he could possibly receive even if the court granted his application and ordered a new trial. And the reason that I say that is because Mr. Craig's receiving of a life sentence, since we're using the phrase functional equivalent, is a functional equivalent of him being convicted of a second degree murder. Mr. Craig nowhere in his application alleges in any way, shape, form, or fashion that he was not a participant in the act that led to the death of Kipp Gullet. He simply alleges, well, I wasn't the sole actor for it. I wasn't the only shooter, or, you know, I wasn't as bad as they say I was. But there is nowhere in any of his application does he ever allege, I wasn't there; I was not a participant.
>
> And so it seems to the court, one, that the issue of whether or not the defense counsel contested the extent of Mr. Craig's participation does not relieve him of the fact that this was a crime committed during the commission of an armed robbery. And[,] as a principal[,] he doesn't have to have been the main actor. He doesn't have to have had specific intent to kill. It is enough for second degree murder that he participated in an armed robbery, and as a result of that armed robbery[,] somebody died. It doesn't make any difference whether he even fired a shot. And I can point you to the case of the other co-defendant who was the only other person that went to trial and that's Mr. Roy Maurer. There was no indication whatsoever that Mr. Maurer ever fired a shot. There was no indication of any greater participation of Mr. Maurer than of any of the other defendants in this case and yet Mr. Maurer was found guilty under Louisiana law under the felony murder doctrine. And even if Mr. Craig were to get a new trial in this case the best outcome that he could conceivably achieve would be a conviction for second degree murder. With a conviction for second degree murder[,] he would still be in exactly the same posture that he is right now. He would be serving a life sentence. So the court doesn't see any conceivable relief that Mr. Craig

Circuit Court of Appeals and the Louisiana Supreme Court, which applications were denied without written opinion on March 1, 2010 and October 8, 2010 respectively.

Craig then filed his habeas petition with this Court on or about November 11, 2010. In his petition, he alleges the same claims that he raised during his post-conviction relief proceedings. The State concedes that Craig's habeas petition is timely; however, it contends that his grand jury foreman race discrimination claim is unexhausted/procedurally barred and therefore should not be considered on the merits by this Court. The State also

---

can receive as a result of prevailing on this post-conviction application that he has not already received by virtue of the Supreme Court setting aside his death verdict in this case. And many of the issues that you couch as guilt phase issues are actually more penalty phase issues. The level of participation, it's not a guilt or innocence where you're talking about the concepts of felony murder. There is no requirement for felony murder – for armed robbery [–] there is no requirement of specific intent, even if under some improbable scenario you could convince a jury that Mr. Craig was so intoxicated that he did not know what he was doing and that he could not have formed specific intent, specific intent is not necessary for an armed robbery. And a killing that takes place during an armed robbery does not have to be a specific intent killing. It could be an accidental killing. It still is second degree murder, and the sentence of second degree murder is still life imprisonment, which is what Mr. Craig currently has imposed in this case. So the court believes that[,] under the provisions of Article 929[,] this court does not have to grant a hearing because I don't see any conceivable additional relief that Mr. Craig can receive other than the life sentence that he's already serving. And so the court will not entertain a hearing on the remaining issues in this case. And the court will deny Mr. Craig's application for post-conviction relief.

* * *

[Defense counsel]: Do I understand your Honor is ruling on all of his pending [post-conviction] claims . . .?

* * *

[The Court]: All of them. Because even – even if he prevailed on all of those things he is not going to – there is no likelihood of any other outcome in this case than Mr. Craig receiving life imprisonment because the evidence in this case clearly establishes at the very least he is guilty of second degree murder, which carries life imprisonment which is the sentence Mr. Craig is already serving.

*See*, Transcript of state trial court's ruling, dated September 30, 2009, R. Doc. 1-23.

contends that Craig's remaining claims should be dismissed with prejudice on the merits.

## LAW & ANALYSIS

**I.     Claim No. 3 - Grand jury foreman race discrimination claim:**

With respect to Craig's grand jury foreman race discrimination claim raised during his post-conviction relief proceedings, the state trial judge found that such claim was procedurally barred because of defense counsel's failure to raise it through a pre-trial motion to quash or "in any way on appeal."  *See*, R. Doc. 1-23, p. 3.[5]  The trial judge determined that, although defense counsel had filed a pre-trial motion seeking to quash the indictment on grounds of grand jury foreman discrimination, that motion to quash was based solely upon *age* discrimination.  Because La.C.Cr.P. art. 536 specifically provides that a motion to quash shall be in writing, that it shall specify distinctly the grounds upon which it is based, and that the court shall hear no objection based upon grounds not stated in the motion, the state trial judge found that Craig was barred from raising the grand jury foreman *race* discrimination claim during post-conviction proceedings because the *race* issue had not been distinctly asserted pre-trial.

Procedural default bars federal habeas review "[i]f a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for dismissal."  *Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003), quoting *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).  The last state court to issue a reasoned judgment concerning Craig's claims, the state trial

---

[5] Although Craig contends that he raised his grand jury race discrimination claim in Assignment of Error No. 48 of his direct appeal, that assignment of error simply stated that, "[t]he trial court erred each time it overruled a motion by defendant not otherwise reserved hereinabove," and the Louisiana Supreme Court expressly ruled that such assignment was "factually and substantively vague" and therefore "unreviewable."

court, clearly and expressly denied his grand jury foreman race discrimination claim on procedural grounds, *i.e.*, because he failed to distinctly specify his race discrimination claim in a pre-trial motion to quash the indictment.[6] [7] Accordingly, this

---

[6] A state procedural rule is independent and adequate when it is independent of a federal law basis and "evenhandedly applied." *Gross v. Cain*, 2010 WL 1552739 (E.D.La. 2010); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997). The state trial judge's reliance upon La.C.Cr.P. art. 536 to dismiss this claim was completely independent of any federal law basis, and there is no evidence before the Court that application of such procedural rule by the state courts is unevenly applied.

[7] Craig's pre-trial motion to quash the indictment was based solely upon a challenge to the "composition of the grand and petit jury venire because of the systematic under-representation of young adults (age 18-30) in the selection of grand juries, grand jury forepersons and petit juries" in East Baton Rouge Parish. See, R. Doc. 1-19, p. 11-12. The motion made absolutely no reference to grand jury discrimination based upon race. Accordingly, under La.C.Cr.P. art. 535(D), that race discrimination claim was waived, and since it was not distinctly specified in the motion to quash, the state trial judge denied consideration of the race discrimination issue on procedural grounds during post-conviction proceedings.

Craig has now submitted an affidavit by his trial counsel, Richard M. Upton ("Upton"), wherein Upton points out that the pre-trial motion to quash made one reference to the fact that grand jury discrimination based upon age was a "non-exclusive" ground for the motion. Upton further notes that "[t]he intent of the Motion to Quash was to challenge the grand jury foreperson selection process on all available grounds, including discrimination based on race and gender." He states that such intent is "evident in the Discovery Motion, by which [defense counsel] sought discovery concerning discrimination in selection of grand and petit juries against 'blacks, women, young people and other cognizable racial, social, age or gender based groups'." *See*, R. Doc. 1-20. The undersigned, however, agrees with the State that Upton's affidavit does not accomplish anything with respect to Craig's present grand jury foreman race discrimination claim. The Louisiana Supreme Court has expressly held that "[a] motion to quash is the appropriate vehicle for challenging the composition and selection of the grand jury;" thus, the fact that Craig may have sought discovery relating to a race discrimination claim via a discovery motion is irrelevant, as he never specifically raised that ground of discrimination in a motion to quash. Furthermore, the fact that Craig may have stated that his motion to quash was based upon "non-exclusive" grounds is insufficient since La.C.Cr.P. art. 536 requires that the grounds upon which a motion to quash is based be specifically stated. Finally, Upton's after-the-fact statement as to the actual "intent" of the motion to quash should be disregarded in light of the fact that the express language of that motion challenges the indictment solely on the ground of age. Although Upton indicates, in his affidavit, that both the motion to quash and the discovery motion were argued together and denied by the trial court in 1992 and that, to his recollection, "all potential grounds for discrimination in the selection of grand jury forepersons – including that based on race and gender – were raised during the argument and considered by the [c]ourt," Craig has not presented any competent evidence, other than his counsel's self-serving affidavit, demonstrating that the trial court actually considered race discrimination as one of the basis for his motion to quash.

The cases cited by Craig, in his habeas petition, for the proposition that this Court should consider his grand jury foreperson race discrimination claim are also inapposite; none of them involve the issue of whether a state trial judge may decline to consider, during post-conviction proceedings, a grand jury foreperson race discrimination claim where that ground was not specifically asserted in a pre-trial motion to quash, nor whether this Court can consider, upon habeas review, such a claim when the state trial court has previously determined that the claim is procedurally barred pursuant La.C.Cr.P. art. 536. *See, State v. Bourque*, 96-0842 (La. 7/1/97), 699 So.2d 1 (which involved *Batson* challenges to the striking of jurors. Defendant raised only race-based challenges to stricken jurors, but on appeal, he asserted that he had enhanced his challenge to include an allegation of gender-based discrimination by stating aloud in court at

Court cannot consider that claim upon habeas review unless Craig has demonstrated: "(1) cause of the procedural default and actual prejudice as a result of the alleged violation of federal law or (2) that failure to consider this claim will result in a fundamental miscarriage of justice." *Pickney*, at 545 (Procedural default bars federal habeas review where state court determines that a grand jury foreman discrimination claim should be dismissed because it was not raised in a pretrial motion to quash indictment unless habeas petitioner can establish the two (2) referenced factors); *Williams v. Cain*, 125 F.3d 269 (5th Cir. 1997).

The undersigned need not address whether Craig has made a showing of "cause"

---

the hearing that the challenge also "goes to all females." The Louisiana Supreme Court assumed that the defendant properly conveyed to the trial court that he was making both a race-based and gender-based *Batson* challenge and therefore considered both grounds on appeal. The case did not involve a situation where Louisiana law specifically requires that all grounds for a challenge be specifically set forth in the motion asserting the challenge, in contrast to the present situation involving a motion to quash a grand jury indictment); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972)(distinguishable because the case involved the issue of whether the U.S. Supreme Court should consider a challenge to the composition of a *petit* jury, even though such challenge had not been listed in the questions for review in the petition for certiorari along with the challenge to the *grand* jury's composition. The Supreme Court held that the issue of the petit jury composition could be considered because the two claims had "been treated together at every stage of the proceedings below." Again, that case did not involve a situation where state law required that a particular ground be specifically asserted in a motion or it was waived; furthermore, in the instant case, no competent evidence has been presented that the state trial court (or any other state court) considered the race discrimination issue. The only evidence in that regard is defense counsel's self-serving, after-the-fact assertion that such is his recollection); *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) and *Woodward v. Epps*, 580 F.3d 318 (5th Cir. 2009)(both involved the issue of whether a habeas court, in a capital case, could consider a defendant's comparative analysis argument in a *Batson* challenge scenario when the state court of appeals had ruled that such argument had been waived because the defendant had not raised it at his *Batson* hearing in the trial court. The defendant argued that the appellate court's decision to not consider his comparative analysis was an inadequate procedural bar, which was neither firmly established nor regularly followed, and his comparative analysis argument could therefore be considered on habeas review even though the state courts had declined to consider it. The Fifth Circuit agreed because the state appellate court's decision not to consider the comparative analysis was contrary to its own prior decision on that point of law, in that the state appellate court had previously held that a defendant is "not required to request the trial judge to make his finding upon the *Batson* motion based upon a comparison analysis in order to have that very same evidence considered on direct appeal." By contrast, in finding that Craig was procedurally barred from presenting his grand jury foreman race discrimination claim on post-conviction review because he failed to specifically present that argument in his motion to quash as required by La.C.Cr.P. art. 536, the state trial judge was not acting contrary to any Louisiana law or prior court decision but instead was enforcing a state procedural rule. As mentioned above, there is no evidence or jurisprudence before the Court demonstrating that such state procedural rule is not firmly established or regularly followed by Louisiana state courts, in contrast to the state appellate court's decision in *Reed* and *Woodward*).

because Craig has failed to show prejudice. After reviewing the trial record, there is no doubt that, even if Craig would have been successful in having his indictment quashed on the ground of grand jury foreman race discrimination, the State of Louisiana nevertheless would have sought and obtained a second indictment. Several of Craig's accomplices on the night in question implicated him as the ringleader and "triggerman" in the murder of Gullet. Craig's wife also implicated him by informing police that Craig admitted to her that he murdered Gullet. Other physical evidence also existed, linking Craig to the crime, including Gullet's keys, his car stereo, and a shell casing, all of which was seized from Craig's room. Considering the strength of the prosecution's case against Craig, a successful grand jury challenge would only have served the purpose of delaying the trial. Thus, Craig will be unable to prove prejudice resulting from the failure to consider his grand jury foreman race discrimination claim, and that claim should therefore be dismissed with prejudice.[8]

## II.    Merits of Craig's remaining claims:

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a state court's adjudication of an issue on the merits is entitled to deference. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The determination as to whether or not a claim has been considered "on its merits" by a state court is "akin to asking whether the state court decision was 'substantive or procedural'," and a state court's summary denial of claims on grounds that are not procedural, as in the present case, is considered a decision on the merits.

---

[8] *See, Pickney*, at 545 (addressing prejudice in terms of ineffective assistance of counsel to avoid a procedural default); *Jones v. Cain*, 2010 WL 3924010 (E.D.La. 2010)(In light of the strong evidence against the petitioner, even if counsel had filed a successful motion to quash the indictment, there was no showing that the result would have been any different); *Brown v. Cain*, 337 F.3d 546, 550, n. 5 (5th Cir. 2003), *cert. denied*, 540 U.S. 117 (2004); *Merridith v. Cain*, No. 04-1227, 2006 WL 2054446, at *8 (W.D.La. 2006); *White v. Cain*, 2007 WL 3270770 (E.D.La. 2007).

*Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999).[9] [10] Federal courts will defer to a state

court's decision on the merits unless it "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

---

[9] *See, Weeks v. Angelone*, 528 U.S. 225, 231, 237, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000)(applying the §2254(d) standard in a case involving a state court's summary denial of a claim without full briefing regarding whether or how §2254(d) applied to a summary decision); *Smith v. Spisak*, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010)(rejecting the petitioner's argument that the §2254(d) deferential standard should not be applied where the Ohio Supreme Court's summary rejection of his claim did not indicate the grounds for its decision); *Chadwick v. Janecka*, 312 F.3d 597, 605-606 (3rd Cir. 2001)(relying on *Weeks* in holding that §2254(d) applies where a state court denies a claim on the merits without giving any indication as to how it reached its decision); *Hennon v. Cooper*, 109 F.3d 330, 334-335 (7th Cir. 1997); *Lewis v. Horn*, 581 F.3d 92 (3rd Cir. 2009); *Muff v. Dragovich*, 2007 WL 776804 (E.D.Pa. 2007); *See, generally,* 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §32.2, pp. 1574-1579 (5th ed. 2005 and 2008 Supp.).

[10] The cases cited in Craig's reply memorandum concerning *de novo* review relate to situations where a claim is "fairly presented" to a state court but that state court completely fails to adjudicate the claim on the merits due to procedural bars, in which case the deferential standard of AEDPA does not apply, and *de novo* review applies if it is determined that the claim was not, in fact, procedurally defaulted, contrary to the state court's determination. *See, Powell v. Quarterman*, 536 F.3d 325 (5th Cir. 2008); *McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003). In contrast to those cases is the present case where, although the state trial judge did not specifically discuss each individual claim raised by Craig in her ruling on his post-conviction relief application, she nevertheless issued a ruling concerning all of those claims that was substantively-based rather than procedurally-based. Accordingly, the state court's decision was "on the merits," and the deferential AEDPA standard applies herein. *Contrast, Williams v. Cain*, 2004 WL 34802, **1 (5th Cir. 2004)(where the Fifth Circuit held that a *de novo* review standard applied because the state habeas court did not state any reasons for its denial of state habeas applications); *Tutt v. Cockrell*, 273 F.3d 1107 (5th Cir. 2001)(finding it was not clear that an adjudication on the merits had occurred in the state habeas court where that court denied the state habeas petition without written order in the face of the state's assertion of a procedural bar).

The Fifth Circuit has specifically addressed arguments like that of Craig in *Green v. Johnson*, 116 F.3d 1115, 1120-21 (5th Cir. 1997). In that case, the habeas petitioner argued that the state courts' "perfunctory disposition" of his post-conviction claims was not a resolution on the merits since those claims were denied without an evidentiary hearing and "without reference to any factual or legal issue presented." *Id.* The petitioner argued that the "resolution-on-the-merits prerequisite is a proxy for the quality of the legal process of resolving a dispute," and he contended that the state court's treatment of his post-conviction claims was required to evince a "careful consideration of the constitutional claims" and a thorough and meaningful substantive evaluation to constitute a decision on the merits. *Id.* The Fifth Circuit disagreed with the petitioner's "proffered construction of the merits inquiry" and his contention that the state courts did not adjudicate his post-conviction claims on the merits. *Id.* The court of appeal explained that "resolution on the merits" is a term of art that refers not to the quality of a court's review of claims, but rather to the court's disposition of the case- whether substantive or procedural. *Id.* Put another way, when there is nothing in a state court's order denying a petitioner's request for post-conviction relief that makes its disposition "procedural," the disposition is "on the merits," regardless of the quality and thoroughness of the court's merits review. *Id.*; *Bullins v. Bookoer*, 247 F.3d 241 (5th Cir. 2001); *Heiselbetz v. Johnson*, 190 F.3d 538 (5th Cir. 1999)(whether an adjudication by a state court is "on the merits" does not depend on whether the state habeas court held a hearing or whether the state court's disposition evinced a careful consideration and a thorough and meaningful evaluation of the claims).

United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d). Furthermore, a state court's factual findings are presumed correct unless the petitioner rebuts the findings with clear and convincing evidence. §2254(e)(1). Finally, a state habeas judge's findings may be entitled to deference even after a paper hearing when the same judge presided over both the trial and habeas proceedings, as in the present case. *Armstead v. Scott*, 37 F.3d 202, 208 (5th Cir. 1994).

Thus, even though the state trial judge in the present matter did not specifically discuss each of Craig's remaining post-conviction relief claims in her ruling denying the claims, she nevertheless denied those claims for the substantive reasons discussed in Footnote 4 above, rather than for procedural reasons. As such, her denial of those claims was a disposition "on the merits," which is entitled to deference unless the denial of such claims is contrary to or an unreasonable application of clearly established federal law or is a decision based upon an unreasonable determination of the facts in light of the evidence.

**(A)    Claim Nos. 1 and 2 - *Boykin, Craig,* and *Strickland*:**

In Claim Nos. 1 and 2, Craig contends that his trial counsel made "numerous admissions of guilt" and failed to make any meaningful effort to oppose the State's evidence during the guilt/innocence phase of his trial, which was the "functional equivalent" of a guilty plea and which deprived him of his right against self-incrimination, his right to have the issue of his guilt or innocence presented to the jury as an adversarial issue, and his right to confront his accusers.[11] Craig contends that, because the record is silent on the

---

[11] Craig contends that, during opening arguments, his counsel conceded his guilt and admitted that the State would be able to prove the elements of its case against him. The following excerpt from his counsel's opening arguments is at issue:

issue of whether he knowingly and intelligently waived those rights, his conviction should be reversed based upon *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Craig further contends that such conduct by his counsel during the guilt/innocence phase of his trial constituted ineffective assistance of counsel in violation of *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1884) or under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

Nearly identical arguments to those of Craig, however, were presented and expressly rejected in a recent case out of the Western District of Oklahoma, *Abshier v. Workman*, 2010 WL 3259817 (W.D.Okla. 2010). Although such jurisprudence is not binding upon this Court, it is both instructive and persuasive as well as in conformity with binding U.S. Supreme Court and Fifth Circuit jurisprudence. In that case, a habeas

---

Good afternoon, ladies and gentlemen, Your Honor, and counsel. Mr. Walsh [the D.A. prosecuting the case] is right, Mr. Walsh is correct, Dwayne did what he just said. On September 15, 1992 he was involved in the offense, the offense that left Kipp Gullet murdered. He's guilty. The parties that Mr. Walsh discussed with you, Zebbie, Roy and James Lavigne, they were with him, they participated. They have cut deals, they are going to testify against Dwayne. Dwayne tried to accept responsibility, he tried to be held accountable, he attempted to plead guilty. But he can't do it. The crime itself is horrible, there are no excuses for what transpired on September 15, 1992, none. And we look and we say, how did this happen, why did it happen? To answer those questions you'll have to learn about Dwayne, that's the only way. This trial is about life or death, the life or the death of Dwayne Craig.

****

 . . . Because we are admitting Dwayne's guilt doesn't mean that we're going to sit back in this case during the guilt phase with our hands folded and not have you see certain pieces of evidence. You will see evidence during the guilt phase of this trial about Dwayne, his character, and his life. You will also hear about the type of people he associated with, Zebbie, Roy, and James. Life or death, that's the only question in this case. Thank you, ladies and gentlemen.

*See*, Trial transcript p. 5340-41 (A portion of the opening statement to which the state trial judge sustained the prosecution's objection has been omitted).

petitioner, convicted on charges of the first degree murder of a child and sentenced to death, contended that his trial counsel abandoned his role as an advocate by conceding the petitioner's guilt without an on-the-record inquiry about whether a knowing and intelligent waiver of rights existed, amounting to an actual or constructive denial of counsel in violation of *Cronic*, *Strickland*, and *Boykin*.  In that case, petitioner's counsel told the jury during voir dire:

> I feel I at least owe you an explanation for why I went to the heart of the matter, which is the death sentence, and that's because [the defendant] committed child abuse murder and the State will prove it beyond a reasonable doubt.  We are here for sentencing and sentencing only, and this is a horrendous crime that has been committed and the D.A. has the upper hand.  I feel like I'm at the foot of a mountain looking up at my goal, which is a fair trial for my client . . . I just want to ask you questions and hopefully reach my goal, which is a fair trial for [the defendant].  And if that occurs, then the justice system has worked.

Trial counsel also told the jury during the first stage of closing arguments:

> [W]e certainly probably could have tried to run some kind of defense, but there's no point in trying to deceive you or make you look like fools by presenting a defense that is not believable, and so we didn't.  And we told you that he did it, and I know it's difficult in a case like this as jurors to sit through evidence in the first stage knowing that his lawyer stood up and said he did it, but I felt that that was the way it should have been done and I did it that way.

*Id.*, at *10.  The Western District of Oklahoma explained that, in prior cases (both capital and non-capital), it had held that a counsel's concession of his client's guilt at trial does not constitute ineffective assistance of counsel *per se.*[12]  Instead, in some circumstances, such

---

[12] *See, Collis v. State*, 685 P.2d 975 (Okl.Cr. 1984)(counsel's concession of guilt during closing argument in non-capital case was not per se ineffective); *Wood v. State*, 1998 OK CR 19, ¶60, 959 P.2d 1, 16 ("In light of the overwhelming evidence against [the defendant in the capital case], trial counsel may have decided not to overstate his case lest he lose credibility for the second stage where he would need it the most.  A fine trial lawyer may well decide that guilt could not be doubted and save the best for saving

as those existing in *Abshier*, where a defendant "has confessed and the evidence is overwhelming, it can be reasonable trial strategy to candidly concede guilt early in the trial in order to establish credibility with the jury in the hope that at least one juror can be persuaded to vote for a sentence less than death in the penalty stage." *Id.*, at *11. The *Abshier* court went on to find that the petitioner "could not hope to win in the guilt or innocence stage" of his trial (since he had "told a story that [the child victim] had been hit by a car - evidence that was controverted by the physical and medical evidence as well as police accident experts," but then had changed his story and admitted to at least two witnesses that he had been in a rage and had struck the victim) and that it was "proper trial strategy for counsel not to destroy his credibility in the [guilt/innocence] stage, but to focus his efforts on obtaining a 'Life Without Parole' sentence rather than 'Death'." *Id.*

The *Abshier* court then specifically addressed the petitioner's claim under *Cronic*, *Boykin*, and *Strickland*. The court first held that *Cronic* was inapplicable under the facts and circumstances of that case, stating the following:

> The Supreme Court in *Cronic* recognized that in rare instances it may be appropriate to presume prejudice 'without inquiry into counsel's actual performance at trial,' because the circumstances ' are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' *Cronic*, 466, U.S. at 658, 662, 104 S.Ct. 2039, 80 L.Ed.2d 657. Circumstances that justify a presumption of prejudice include

---

his life. We do not find counsel's performance deficient under the circumstances"); *Hale v. State*, 1998 OK CR 24, ¶48, 750 P.2d 130, 142 ("[Petitioner] also claims that counsel admitted his client's guilt during first stage closing arguments. [Footnote: "In closing argument, defense counsel stated, ' There isn't any doubt that [the petitioner] was involved in this. No doubt whatsoever. How much though? To what extent?'"] We have held that conciliatory remarks of counsel may show ineffective assistance [Citation omitted], but we find nothing prejudicial in counsel's statement. Claiming that the [petitioner] had not been involved at all would have completely destroyed counsel's credibility before the jury in light of overwhelming evidence of [petitioner's] identity and testimony that [petitioner] was apprehended with the ransom money after a chase by law enforcement officials"); *Trice v. State*, 1996 OK CR 10, ¶19, 912 P.2d 349, 355 ("In light of the fact that [the defendant] confessed to having raped the victim, we find that his trial attorneys' strategic decision to concede guilt was neither unreasonable nor prejudicial").

the absence of counsel at a critical stage of trial, the denial of the right to effective cross-examination, and the complete failure to subject the prosecution's case to adversarial testing; but, as the Supreme Court points out, a presumption of prejudice is the exception, not the rule. *Id.* at 659, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657.

The *Abshier* court further noted that *Cronic*'s "presumed prejudice" is only applicable in cases where an attorney "abandoned the required duty of loyalty to his client and acted with reckless disregard." *Abshier*, at 12. In order to presume prejudice under *Cronic*, "the attorney's failure to test the prosecutor's case must be complete." *Bell*, 535 U.S. at 686, 122 S.Ct. 1843, 152 L.Ed.2d 914.[13] The court also explained that it had repeatedly found the *Cronic* presumption inapplicable where "counsel actively participated in all phases of the trial proceedings," and that it had only held that a "complete absence of meaningful adversarial testing" had occurred when the evidence "overwhelmingly established that [the] attorney abandoned the required duty of loyalty to his client," and where counsel "acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." Considering those standards, the *Abshier* court found that the petitioner's representation and trial were not a "complete failure of adversarial testing" because his counsel was present in the courtroom throughout his trial, presented evidence, made evidentiary objections, conducted cross-examination, and made an opening statement and closing argument. The court therefore held that *Cronic*'s

---

[13] *See also, Haynes v. Cain*, 298 F.3d 375 (5th Cir. 2002)(en banc), *petition for certiorari denied*, 537 U.S. 1072, 123 S.Ct. 676, 154 L.Ed.2d 567 (2002)(In order for the *Cronic* presumption of prejudice to apply in ineffective assistance of counsel claim, an attorney must "completely fail to challenge prosecution's case, not just individual elements of it"); *U.S. v. Holman*, 314 F.3d 837 (7th Cir. 2002)(*Cronic* only applies if counsel fails to contest *any* portion of the prosecution's case; if counsel mounts a partial defense, *Strickland* is the more appropriate test); *Turner v. Louisiana State Penitentiary*, 2009 WL 3333177 (W.D.La. 2009)(Unless counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, complaints about his strategy are assessed under the *Strickland* standard).

19

presumed prejudice standard was not the proper standard to apply in determining whether the petitioner's counsel was ineffective.

The *Abshier* court also determined that the petitioner's *Boykin* claim lacked merit.[14] Like Craig, the petitioner in *Abshier* claimed that the statements of his trial counsel were the equivalent of a guilty plea and that the court should have made a record that the defendant knowingly and voluntarily waived his rights to the:  (1) privilege against self-incrimination, (2) the right to trial by jury, and (3) the right to confront one's accusers.  The court, however, concluded that counsel's statements during trial were not the equivalent of a guilty plea, that the petitioner had not, in fact, formally pled guilty, and that the petitioner also had not surrendered any of those important constitutional rights.  The court noted that the petitioner had not testified and therefore did not subject himself to cross-examination, that his lawyer vigorously confronted his accusers, and that the petitioner preserved his right to jury sentencing and therefore had the opportunity to plead to the jury for mercy.  Finding no violation of *Boykin*, the court stated:

> As a matter of trial strategy, trial counsel admitted only what he knew the State could prove, so that he could maintain his credibility with the jury for the critical second stage.  Had [the petitioner] wished to plead guilty in the present case, then the mandates established [by *Boykin*] would have applied.  We find from the record that he did not plead guilty, but maintained his right to jury sentencing, to confront and cross-examine the witnesses against him, to not testify, and to not be subjected to cross-examination.

*Id.*, at *12.

Finally, the *Abshier* court analyzed the petitioner's ineffective assistance of counsel

---

[14]  In *Boykin*, the U.S. Supreme Court held that, because a guilty plea involves the waiver of several constitutional rights, it must be made knowingly and voluntarily, and before a trial court may accept a guilty plea, it must ascertain that the defendant "has a full understanding of what the plea connotes and of its consequences."  Id., 242-44.

claim under the dictates of *Strickland* and stated the following:

> In *Strickland*, the Supreme Court held that '[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.' 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. 'First,' the Court noted, 'the defendant must show that counsel's performance was deficient.' *Id.* 'This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' *Id.* 'Second,' the Court noted, 'the defendant must show that the deficient performance prejudiced the defense.' *Id.* 'This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.* 'Unless a defendant makes both showings,' the Court held, 'it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' *Id.*

> ***

> Subsequent to Petitioner's trial and appeal, the Supreme Court considered the same issues raised here by Petitioner in a case with strikingly similar facts. Although not established at the time of the [appellate court's] determination, the Supreme Court's reasoning is illustrative of the proper application of *Cronic* and *Strickland* when counsel decides to not deny guilt and to focus on sentencing. In *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), the petitioner was tried for first-degree murder, kidnapping, robbery and arson. The state had gathered overwhelming evidence that Nixon had committed the murder in the manner he described in a confession to the police. Prior to trial and after discovery, Nixon's appointed counsel concluded that Nixon's guilt was not 'subject to any reasonable dispute.' *Id.* at 180-81. Trial counsel focused on the penalty phase of the trial, determining that denying Nixon's guilt in the first stage of trial would compromise both his credibility with the jury and his ability to effectively seek leniency during the second stage of trial. *Id.*

> On direct appeal, Nixon argued that trial counsel rendered ineffective assistance by conceding his guilt without obtaining his express consent. Nixon relied on *Cronic* and argued the concession should be presumed prejudicial because it left the prosecution's case 'unexposed to meaningful adversarial testing.' *Id.* at 185. [Footnote 1: Nixon also contended in the

alternative that the concession of guilt was unreasonable and prejudicial under the standard set forth in *Strickland. Id.* at 186, n. 4]. The Supreme Court granted certiorari to resolve the question of 'whether counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial automatically renders counsel's performance deficient, and whether counsel's effectiveness should be evaluated under *Cronic* or *Strickland.' Id.* at 186-87. The Court first determined that the attorney's statements at trial were not the functional equivalent of a guilty plea, in that despite the concession of guilt, Nixon retained the rights afforded to a defendant in a criminal trial. *Id.* at 181 (citing *Boykin v. Alabama*, 395 U.S. 238, 242-43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)). The state was still required to present evidence during the guilt stage of trial to establish the essential elements of the crime. The defense reserved the right to cross-examine witnesses and to seek to exclude prejudicial evidence. Further, in case of error, a concession of guilt would not hinder the defendant's right to appeal. *Id.* Due to these factors, and because Nixon's attorney had cross-examined witnesses and sought exclusion of prejudicial photographs, the Supreme Court first held that Nixon's attorney's concession of guilt 'does not rank as a fail[ure] to function in any meaningful sense as the Government's adversary.' *Id.* at 190-91. It then considered the seriousness of capital cases and the reasonableness of trial counsel's strategic decisions and held that counsel's strategy, given the evidence of Nixon's guilt, satisfied the *Strickland* standard and no tenable claim of ineffective assistance of counsel remained. *Id.* at 192.

In the instance case, trial counsel's actions were not the functional equivalent of a guilty plea. The state was still required to prove each element of the crime beyond a reasonable doubt. Despite counsel's strategic concession, Petitioner retained all the rights afforded him in a criminal trial. Accordingly, it was neither improper nor unreasonable for the [appeals court] to apply *Strickland* instead of *Cronic. Strickland* was clearly established federal law at the time of the [appeals court]'s review and determination of Petitioner's claim . . . Petitioner has failed to demonstrate that the [appellate court]'s determination was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Petitioner's first ground for relief is denied.

*Abshier*, at *13-14.

For the same reasons articulated in *Abshier*, the undersigned finds that Craig's claims under *Boykin*, *Cronic*, and *Strickland* should be denied. First, under the jurisprudence discussed above, his counsel's concession of guilt on his behalf was not the equivalent of a guilty plea, which required that Craig be "boykinized." Craig did not give up any of the three (3) above-referenced constitutional rights when his counsel elected to concede guilt during the guilt/innocence phase and to focus efforts on obtaining a reduced sentence during the penalty phase. Craig was unable to formally plead guilty, and the State was still required to prove all of the elements of the crime of first degree murder beyond a reasonable doubt. Furthermore, Craig did not give up his right to not take the witness stand, his right to a trial by jury, his right to confront his accusers, or his right to object to evidence presented by the State. He also preserved his right to jury sentencing and therefore had the opportunity to plead to the jury for mercy. His counsel's concession of guilt also did not impede his right to appeal any errors that may have been committed at his trial. Under the circumstances, there was no violation of *Boykin* in Craig's case, and the state trial court's decision dismissing Claim No. 1 on the merits therefore was not contrary to or an unreasonable application of federal law nor was it an unreasonable determination of the facts in light of the evidence. Accordingly, Claim No. 1 should be dismissed.

The undersigned also finds that *Cronic* does not apply in Craig's case because there was not a "complete failure of adversarial testing" by his counsel. Craig's counsel was present in the courtroom for the entirety of his trial, presented evidence on Craig's behalf, objected to evidence presented by the State, cross-examined the State's witnesses, and made opening and closing arguments. The undersigned's review of the trial record does

not reveal that Craig's counsel abandoned his duty of loyalty to Craig or that he acted with reckless disregard for Craig's best interest or with any intention to weaken Craig's case. By contrast, it appears that Craig's counsel recognized the overwhelming evidence against his client and, as a matter of trial strategy, elected to concede that the State could prove the elements of its case during the guilt phase so that he could maintain his credibility with the jury for the critical sentencing phase.[15] [16] As in *Abshier*, the presumed prejudice standard of *Cronic* is not the proper standard to apply in determining whether Craig's counsel rendered ineffective assistance.[17]

---

[15] As *Cronic* explained, the Sixth Amendment "does not require that counsel do the impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic*, at 657, n. 19.

[16] During his closing arguments, Craig's counsel explained the strategy of conceding Craig's guilt to the jury. He stated that such strategy was used so as not to insult the jury's intelligence and "make a mockery" of the "horrible loss" that resulted from Gullett's murder. He further explained that Craig had attempted to plead guilty prior to trial and to proceed straight to the penalty phase so the jury could determine his punishment but had not been allowed to do so. Finally, defense counsel explained that the jury should know about Craig's background before determining his punishment. *See*, Tr. Trans., p. 5615.

[17] Although Craig relies upon *People v. Hattery,* 488 N.E.2d 513 (Ill. 1985)(where it was held that counsel may not concede his client's guilt in the hope of obtaining a more lenient sentence where a formal plea of not guilty has been entered, unless the record adequately shows that defendant knowingly and intelligently consented to his counsel's strategy) in support of his position that his counsel's concession of guilt constituted ineffective assistance of counsel, *Hattery* has been narrowly construed in subsequent cases because of the danger that an unscrupulous defense attorney, especially in a death penalty case, would deliberately concede his client's guilt in order to lay the groundwork for later reversal and because it is even possible that a defendant and his counsel might conspire to that end. Accordingly, if a concession of guilt is made at trial by defense counsel, *Hattery* has been limited to hold that ineffectiveness may be established, but a defendant "faces a high burden before he can foresake the two-part *Strickland* test." *People v. Johnson*, 128 Ill.2d 253, 538 N.E.2d 1118 (Ill. 1989).

Additionally, *Hattery* is distinguishable from the present matter because, in that case, it does not appear that the defendant attempted to enter a guilty plea but instead entered a formal plea of not guilty, and his counsel did not present any defense theory or closing arguments. Although Craig contends that his counsel did not present any defense theory, a review of the cross-examination of the State's witnesses reveals that his counsel attempted to establish that Lavigne and Berthelot lacked credibility on the issue of drug/alcohol use on the night of the crime and also that they (and Yatter) were biased as a result of having entered plea deals with the State in exchange for their testimony against Craig. Through the cross-examination testimony elicited on those issues, defense counsel attempted to present the crime in a light in which the jury might have found some mitigating aspect. Such efforts by counsel supported the defense theory now proposed by Craig, *i.e.*, that Gullet's murder was "the unintended and spontaneous result of poor judgment and poor decision-making by four drug and alcohol impaired teenagers" and that the testimony implicating Craig as the ringleader lacks credibility because it was elicited solely from witnesses

Furthermore, under the correct *Strickland* standard, the undersigned finds that the conduct of Craig's counsel was not deficient, and even assuming it was deficient, such conduct did not prejudice the outcome of Craig's case. Under the jurisprudence discussed above (as well as other cases),[18] it can be a reasonable trial strategy, where there is overwhelming evidence against a criminal defendant, to concede the defendant's guilt during the guilt/innocence phase and thereby preserve credibility and focus for the

sentencing phase.[19] The strategic decision to concede guilt not only preserved counsel's

---

who had been "bought off" by the State.

[18] *See also, Nixon v. Epps*, 405 F.3d 318 (5th Cir. 2005)(holding that defense counsels' choice to plead for the defendant's life instead of offering "flimsy mitigating evidence" was a strategic decision that was not unreasonable in a capital murder case, and thus, did not constitute deficient performance as required to establish ineffective assistance of counsel under *Strickland*); *Haynes v. Cain*, 298 F.3d 375 (5th Cir. 2001); *Holder v. U.S.*, 2008 WL 2909648 (E.D.Mo. 2008)(Counsel used the concession of guilt as a way to present his client as one accountable for what was obvious, so he could make a credible, consistent challenge to the government's evidence that petitioner was the one who shot the victim. Counsel's strategy was a reasonable one to acquire the best outcome for the petitioner, namely the avoidance of the death penalty); *Parker v. Head*, 244 F.3d 831, 840 (11th Cir. 2001); *Sondey v. White*, 2009 WL 4800413 (E.D.Mich. 2009), quoting *United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002) and citing various cases ("[C]onceding an indefensible charge is thought to build credibility with a jury by acknowledging the overwhelming evidence of guilt for that particular charge, creating goodwill and trust that can be applied towards attacking the remaining charges").

[19] The cases cited by Craig in support of his proposition that his counsel's concession of guilt at trial violated *Boykin* and constituted ineffective assistance of counsel are distinguishable from the present matter. For example, *Wiley v. Sowders*, 647 F.2d 642 (6th Cir. 1981), is distinguishable because, in that case, defense counsel's admission of his client's guilt was directly contrary to his client's earlier-entered plea of "not guilty." The court held that an attorney may not admit a defendant's guilt, contrary to the defendant's wishes, unless the defendant unequivocally understands the consequences of the admission. *Id.*, 649-50. By contrast, in the present case, Craig attempted to enter a formal plea of guilty on the record, and, even though that guilty plea could not be accepted by the Court due to La.C.Cr.P. art. 557, it is apparent from such attempted guilty plea that Craig wanted to accept responsibility for his actions. Furthermore, Craig has not presented any evidence to the Court suggesting that, at the time of trial, the decision to concede his guilt was against his wishes. Although his counsel has now submitted an affidavit indicating that he did not fully explain the consequences of the concession strategy to Craig before the trial commenced, counsel's affidavit nevertheless indicates that, after the court denied Craig's offer to enter a formal guilty plea, counsel informed Craig that he intended to admit his guilt to the jury during the guilt phase of the trial and to argue to the jury, as mitigation, that the law prevented Craig from pleading guilty. The affidavit, in no way, indicates that Craig objected to or instructed his counsel not to pursue that

credibility but also may have had the effect of demonstrating to the jury that Craig had

accepted responsibility for his actions, which could be beneficial during the sentencing

---

strategy. Moreover, by virtue of the fact that counsel implemented that strategy during opening arguments, immediately after those discussions with Craig, it appears that Craig must not have objected to the strategy. Additionally, the fact that defense counsel continued to pursue that strategy throughout trial and even during closing arguments suggests that Craig never objected to the strategy at the time of his trial. *Cronic* provides that there is no blanket rule demanding a defendant's explicit consent to a concession of guilt strategy in a capital case, and a defendant's "after-the-fact disagreement" with the strategic choices of his attorney does not establish deficient performance. *Cronic*, at 192; Crane *v. Johnson*, 178 F.3d 3090, 312 (5th Cir. 1999). Furthermore, when a defendant, informed by counsel, neither consents to nor objects to the course counsel describes as the most promising means to avert a sentence of death, counsel is not automatically barred from pursuing that course; in fact, the Fifth Circuit has suggested, in the *en banc* opinion of *Haynes*, that there are certain situations in which a criminal defense counsel is free to disregard his client's express and specific directives regarding trial strategy. *Nixon*, at 178; *Wood v. Dretke*, 386 F.Supp.2d 820 (W.D.Tex. 2005). Finally, although Craig's defense counsel states in his affidavit that he did not fully explain to Craig that he would be relinquishing his trial rights by virtue of the concession strategy, the undersigned finds that such discussion was not necessarily required since Craig did not, in fact, relinquish those rights as discussed above.

*Wiley* is also distinguishable because, unlike in the present case, where there is extensive evidence indicating Craig's guilt rendering defense counsel's guilt concession strategy during the innocence/guilt phase reasonable, that case did not involve "strong circumstantial evidence" against the defendant since no witness observed the burglary, and no one saw a gun in the hand of either of the defendants. The *Wiley* court hypothesized, "Who can be sure that both or either of these brothers would have been convicted [of first degree murder] had not the jury been told by defendant's own attorney 'they're guilty?'" The same cannot be said in Craig's case considering the plethora of witness' testimony and strong circumstantial evidence implicating him in the murder of Gullet.

The case of *Mullins v. Evans*, 473 F.Supp. 1321 (D.C.Colo. 1979), cited by Craig, is also distinguishable from the present matter because, unlike Craig's counsel, the defense counsel in that case, not only conceded the defendant's guilt but also literally did nothing else to defend the defendant's case. He made no opening statement, objected only three times to the State's evidence, made no closing argument, specifically stated in front of the jury that he had advised the defendant that he could testify in his own defense but that the defendant did not wish to testify, and permitted the case to be submitted to the jury on a record in which the result was a foregone conclusion. In counsel's own words, the defender "threw the fight." The habeas court found the defense counsel's conduct objectionable, particularly because it was a case that clearly called for leniency. Considering the strong evidence implicating Craig in Gullet's murder and the fact that his counsel did not "throw the fight" but still provided arguments to the jury, objected to evidence, and cross-examined and tested the credibility of the State's witnesses, the same cannot be said of defense counsel in Craig's case.

*Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983) can be distinguished because defense counsel not only failed to provide meaningful advocacy on the issue of guilt in that case, but he actually urged the jury to return a verdict of guilty, declaring, at one point, "I think he went in the house and I think he committed the crime of murder." The court noted that not even a prosecutor is permitted to express such a personal opinion as to a defendant's guilt. Moreover, the defendant in that case had entered a formal plea of not guilty, had denied any involvement in the crime, and had an "insubstantial" insanity defense. The court therefore found that counsel's concession of his client's guilt was irrational and constituted ineffective assistance.

phase.[20]  Moreover, although defense counsel conceded Craig's involvement in the murder of Gullet, the State correctly points out, in its opposition, that defense counsel did not entirely "throw the fight" during the guilt/innocence phase.  His counsel frequently objected to evidence/testimony presented by the State,[21] cross-examined the State's witnesses,[22] and attacked the credibility/bias of the State's two primary witnesses, Lavigne and Berthelot, in an effort at depicting them as habitual drug users who, despite their denials,

---

[20] In *Cronic*, the U.S. Supreme Court recognized that the "gravity of a potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus."  *Cronic*, at 190-91.  The court explained that attorneys representing capital defendants face daunting challenges in developing trial strategies primarily because the defendant's guilt is often clear.  *Id.*, at 191.  In such cases, prosecutors are more inclined to seek the death penalty and to refuse to accept pleas to a life sentence, when the evidence is overwhelming and the crime is heinous.  *Id.*  "[A]voiding execution [may be] the best and only realistic result possible."  *Id.*  Thus, defense counsel may "reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared."  *Id., citing* Lyon, Defending the Death Penalty Case: What Makes Death Different? 42 Mercer L.Rev. 695, 708 (1991)("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation.  This just does not work.  The jury will give the death penalty to the client and, in essence, the attorney"); Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1589-91 (1998)(interview of jurors in capital trials indicate that juries approach the sentencing phase "cynically" where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense); *Id.*, at 1597 (in capital cases, a "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have dire implications for the sentencing phase).  The *Cronic* court therefore concluded that, "in a capital case, defense counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." *Id.*, at 192.  "When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent."  *Id.*  "Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain."  *Id.*

[21] In addition to numerous objections concerning leading and hearsay testimony that the State attempted to elicit, defense counsel vigorously objected to and obtained exclusion of a number of photographs taken at the murder scene and during the autopsy on the basis that such photographs were overly inflammatory and prejudicial to his client as well as cumulative.  Defense counsel also objected to foundation and chain of custody issues relating to introduction of the handgun that was seized from Berthelot's possession upon his arrest, objected to the qualification of the State's expert on fire causes and origin, and objected to certain photographs taken during the search of Craig's residence and of the burned Bronco, some of which were sustained by the state trial court.

[22] In cross-examining the physician that performed Gullet's autopsy, Dr. Suarez, defense counsel focused on the location of one of the blows sustained by Gullet in the head in an attempt at placing blame upon Lavigne (who struck Gullet in the head just prior to Gullet being shot) for Gullet's death.  The prosecution expressly addressed this theory in its rebuttal closing argument.  *See*, Tr. Trans., p. 5619.

could have been using drugs on the night of the murder[23] and who were only giving testimony against Craig because they had received plea deals from the State.[24]

However, even assuming the concession of guilt by Craig's counsel was deficient trial strategy (or was deficient conduct because counsel failed to obtain petitioner's express consent to such strategy), the undersigned cannot find that Craig was prejudiced.[25]  To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.

---

[23] In addition to getting Berthelot to admit that he had both used and sold various types of drugs in the past, defense counsel elicited testimony from Berthelot that, on the night that he was arrested relative to Gullet's murder, he was "extremely intoxicated" on pills and did not even remember how many pills he had in his possession at that time.  *See*, Tr. Trans., p. 5540.

[24] Defense counsel attempted to besmirch the credibility of Yatter by insinuating, through questioning, that Yatter was testifying against Craig out of fear of criminal exposure and/or losing custody of her daughter.  Defense counsel also attacked Yatter's credibility by pointing out that Yatter had initially indicated, during a meeting with defense counsel in March 1993, that she did not really remember the conversations she had with Craig on the night of the murder (which was contrary to her specific recollection of such conversations to which she testified at trial) and by getting Yatter to admit that she had not told the truth about Craig's involvement when she was interviewed on TV immediately following the murder.  Defense counsel also thoroughly questioned the State's primary witnesses about their plea deals and meetings with the prosecution/investigators and about the fact that, at the time that they testified against Craig, their sentences had not yet been determined, suggesting that their testimony may have been influenced by the prosecution/investigators and that their sentences could be more or less harsh depending upon the testimony they ultimately provided.  Defense counsel also elicited testimony from Berthelot and Lavigne about the fact that Berthelot had previously shot his stepfather and that Berthelot wore the spent shellcasing from that shooting on a necklace (along with a sterling silver marijuana leaf) around the time of the murder.  Defense counsel also got Berthelot to admit that he wore that shellcasing to show that he was "hard" or "cool" to his peers.  Additionally, defense counsel got Berthelot to admit that he may have bragged about the fact that he had been "packing heat" since he was about twelve (12) years old.  Defense questioning also brought out the fact that Berthelot, Lavigne, and Maurer had been in the same line of cells in parish prison on different occasions and had had conversations.  Furthermore, Lavigne confirmed, during cross-examination, that he personally knew that Berthelot had been "packing [a] 9 [millimeter]" for at least seven to eight months prior to Gullet's murder.  Defense counsel also had Berthelot and Lavigne label a diagram of Kirby Smith dorm parking lot with their respective positions at the time that Gullett was kidnapped, in an effort at showing inconsistencies in their stories.  Finally, in cross-examining Brandy Nicole Longman, who had been at Lavigne's house with Craig and his accomplices just prior to the kidnapping/murder, defense counsel was able to elicit that the witness had seen Craig and his accomplices use numerous drugs in the past.  The preceding examples are the primary ways in which defense counsel attempted to damage the credibility of the State's central witnesses during the guilt/innocence phase of Craig's trial.

[25] *Haynes*, at 375 (Even when counsel makes a guilt concession without his client's consent, a resulting ineffective assistance claim is not judged under *Cronic*, but under the traditional *Strickland* test that requires establishment of prejudice); *Wilson v. Cain*, 2009 WL 2163124 (E.D.La. 2009).

*Strickland*, 104 S. Ct. at 2067. To prove prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,104 S.Ct. at 2068. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* Considering the overwhelming evidence against Craig, the undersigned cannot say that, if Craig's counsel had chosen not to concede guilt and instead had adopted the trial strategy proposed by Craig (*i.e.*, that Gullet's murder was "the unintended and spontaneous result of poor judgment and poor decision-making by four drug and alcohol impaired teenagers"),[26] there is a reasonable probability that the result of Craig's proceeding would have been any different.[27] As discussed above, the evidence against Craig presented by the State at trial included detailed testimony by two accomplices/eyewitnesses concerning the leadership role Craig took in the carjacking, taunting, kidnapping, and murder of Gullet. It also included the testimony of Craig's own

---

[26] *See*, Craig's habeas petition, p. 9.

[27] *See, Haynes v. Cain,* 298 F.3d 375 (5th Cir. 2001) (Following state conviction for first degree murder, petition for federal habeas relief was brought alleging ineffective assistance of counsel. Fifth Circuit held: (1) that district court should not have reviewed the state court's decision that defense counsel had not provided ineffective assistance de novo but instead should have applied deferential AEDPA standard; (2) that the opening-statement concession by defense counsel that defendant was guilty of second-degree murder was a strategic attempt to avoid the death penalty, not a failure to subject the prosecution's case to meaningful adversarial testing, and thus did not raise the *Cronic* presumption of prejudice; and (3) that failure to obtain the defendant's consent before conceding to second-degree murder did not prejudice defendant); *Woodward v. Epps*, 580 F.3d 318 (5th Cir. 2009)(State court reasonably concluded that the defendant was not prejudiced, in a capital murder case, by defense counsels' trial strategy of "opening the door" to allow in evidence of the defendant's prior bad acts, and that therefore habeas relief was not warranted on such basis. Preemptive introduction of the prior acts evidence was held to be sound strategy since counsel would have been unable to prevent its admission due to its inclusion in the defense psychologist's report, and in any case, the evidence had no effect upon the balancing test the jury ultimately used to determine the application of the death penalty); *Wilson v. Cain*, 2009 WL 2163124 (E.D.La. 2009)(Even if it is assumed that defense counsel performed deficiently by failing to obtain his client's consent to a particular trial strategy, considering the strength of the prosecution's evidence, petitioner failed to establish that he would have been acquitted had his proposed defense been employed, and he therefore could not show that it was objectively unreasonable for the state court to conclude that he was not prejudiced).

wife that Craig confessed to the murder and described the murder in detail just as the accomplices had described it. Finally, physical evidence seized from the murder scene and Craig's room corroborated the three witnesses' testimony and linked Craig to the carjacking and murder. Given the consistency in the various witnesses' testimony as to the events on the night in question and regarding their denial of drug/alcohol use on that night, there is no reason to believe that the jury would have questioned the witnesses' credibility and believed the theory of the case proposed by Craig.[28]

Furthermore, as the state trial judge concluded, in denying Craig's post-conviction relief application, even if Craig's counsel had pursued a trial strategy that the prosecution could not prove Craig had the specific intent to kill necessary for a first degree murder conviction (either because he was impaired by drugs or alcohol at the time of the murder and/or because he was only a participant in the events of the night and did not actually fire the lethal shot at Gullet), it is not reasonably probable that the ultimate outcome for Craig would be any different. Even if his counsel had pursued that strategy, it is reasonably probable that Craig would been convicted of second degree murder (like his accomplice, Maurer) in any event, and he would nevertheless be serving a life sentence,[29] just as he

---

[28] *See, Haynes*, at 382-383 (holding that defense counsel's failure at the outset of first-degree murder trial to obtain defendant's consent before conceding in opening argument that defendant was guilty did not prejudice the defendant and thus could not amount to ineffective assistance. The Fifth Circuit noted that defense counsel "faced the demanding task of defending a client who was accused of committing a brutal and senseless crime." Considering the prosecution's nearly conclusive evidence that the defendant committed the offense in question, even if defense counsel's conduct in not obtaining the defendant's consent to concede guilt at trial was considered deficient, the Louisiana Court of Appeals properly concluded that the defendant had failed to establish that, without the concession strategy, he would have been acquitted of first degree murder. Consequently, the defendant could not show that the state habeas court's conclusion that he was not prejudiced by his attorney's strategy was objectively unreasonable.

[29] The punishment for second degree murder is life imprisonment without the benefit of suspension of sentence, probation, or parole. La.R.S. 14:30.1; *State v. Boyer*, 2010-693 (La. App. 3 Cir. 2011), 2011 WL 312690, *39.

is now.  It is unlikely that, if Craig's counsel had pursued the alternative trial strategies now proposed by Craig, that he either would have been acquitted or that his sentence would have been any different.  As such, Craig cannot prove either the deficiency or prejudice prongs of his *Strickland* ineffective assistance of counsel claim, and the state trial court's decision dismissing such claim therefore was not contrary to or an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence.  Accordingly, Claim No. 2 should also be dismissed.[30]

---

[30] In his habeas petition, Craig asserts several other alleged errors by his counsel that he contends constitute ineffective assistance under *Strickland*: (1) that his counsel failed to demonstrate bias on the part of the State's witnesses; (2) that his counsel failed to cross-examine the State's witnesses concerning drug use; (3) that his counsel failed to investigate a theory that there was a second gunman that fired at Gullet, whose bullet could have been the one that killed Gullet; (4) that his counsel failed to point out inconsistencies in witness testimony; and (5) that his counsel failed to point out to the jury that Maurer did not testify even though the State promised, during opening arguments, that Maurer would testify that Craig expressed to him an intention to kill Gullet while the two were alone outside the Bronco at the gas station.  Those assertions also lack merit.  Defense counsel attempted to demonstrate bias on the part of the State's witnesses by specifically cross-examining them concerning the plea agreements they entered into with the State in exchange for their testimony.  *See*, Trial transcript, pp. 5537-38, 5598-99, and 5424-25.  The terms of the plea agreements had also been fully elicited by the State on direct examination of those witnesses.  *Id.*, pp. 5408-09, 5516-17, and 5592-93.  His counsel also specifically questioned the State's witnesses about their history of drug use and concerning use of drugs and/or alcohol on the night of the murder.  *Id.*, pp. 5418-19, 5538-40, and 5600.

Relative to the "second gunman" theory, Craig contends that, even though five shots were allegedly fired at Gullet, police only recovered two bullets from the crime scene, and there were therefore three missing bullets that could have been fired from Lavigne's gun, instead of Craig's.  First, the undersigned finds that such a "second gunman" theory was speculative, when concrete expert evidence presented by the State supported the fact that all four of the shell casings that were found at the scene were not fired from the gun that Lavigne had used to strike Gullet and that a fifth shell casing was recovered by police from Craig's room, accounting for all five of the shots allegedly fired at Gullet.  Furthermore, although Craig contends that his counsel was deficient in not having that fifth shell casing that was seized from Craig's room tested to see if it could have been discharged from Lavigne's gun, the undersigned finds that such conduct by his counsel, even if deficient, did not prejudice Craig.  Even if such shell casing had been tested and it had been proven that there was a potential "second gunman," there is no evidence demonstrating that the bullet shot by that "second gunman" was the one that actually killed Gullet, as opposed to the bullets that were shot by Craig (*i.e.*, the "second gunman" theory still would have required speculation on the part of the jury).  As such, there is not a reasonable probability that such additional evidence would have changed the outcome of Craig's case.  The undersigned will not second-guess defense counsel's tactical decision not to investigate and/or present the "second gunman" theory since, in all likelihood, Craig still would have been convicted of first or second degree murder even if that speculative theory would have been presented.

As to the allegation concerning "inconsistencies" in witness testimony, the undersigned finds that certain of the alleged "inconsistencies" referenced by Craig in his habeas petition are not actually

**(B)    Claim No. 4 - *Brady* evidence:**

In his fourth claim, Craig contends that the State knowingly withheld evidence that would have been favorable to him on issues of guilt and mitigation and also would have contradicted testimony offered by Lavigne and Berthelot.  The evidence at issue is an affidavit obtained by the prosecution from Lavigne's roommate, Mark C. Whalen ("Whalen"), prior to Craig's trial, which affidavit indicated that Craig and his three accomplices were intoxicated on drugs and alcohol at the time of the crime.[31]  Craig

---

"inconsistencies," but instead are simply omissions.  Craig contends that there was an "inconsistency" in Berthelot's trial testimony, as compared to his taped confession, because, at trial Berthelot testified that Maurer told him that Craig had expressed to Maurer an intention to kill Gullet, while Berthelot's confession made no mention of such statement by Maurer.  The fact that Berthelot may have left that information out of his confession, whether inadvertently or not, does not make his trial testimony, which provided that additional item of information, inconsistent.  It just means that Berthelot's trial testimony provided more thorough information than his confession had.  Craig also points to an "inconsistency" between Berthelot's trial testimony that Craig struck Gullet in the head with his weapon when Gullet was getting out of his vehicle on LSU campus, in contrast to Berthelot's and Lavigne's recorded confessions, which indicated that Craig did not strike Gullet but instead only put his gun to Gullet's head and forced him into the vehicle.  While there is certainly an inconsistency between striking someone in the head and simply putting a gun to their head and Craig's counsel may have been deficient in failing to note that discrepancy for the jury, the undersigned nevertheless finds that the outcome of Craig's case was not prejudiced by that discrepancy in the evidence.  The manner in which Craig was able to coerce Gullet to get into the vehicle was only one item in the mountain of evidence against him.  Even assuming defense counsel had objected and the jury had been instructed to disregard the testimony that Craig had hit Gullet with the gun at the initiation of the kidnapping, in light of all of the other evidence of cruel taunting by Craig and of the extremely violent manner in which Gullet was ultimately shot, it is reasonably probable that the jury still would have found Craig guilty of first degree murder.

Finally, as to Craig's counsel's failure to point out that Maurer did not testify despite the prosecution's representation that he would, the undersigned likewise does not find ineffective assistance.  As was noted in the state trial judge's ruling on Craig's post-conviction relief application, Maurer was the only one of Craig's accomplices that did not plead guilty and instead proceeded to trial.  It is very possible that he chose not to testify at Craig's trial because of his own pending proceedings.  Moreover, considering the strong evidence against Craig, the undersigned does not find that the mere revelation by defense counsel that the prosecution failed to carry through on its representation that Maurer would testify would have changed the outcome of Craig's case.  Accordingly, Craig's other theories of ineffective assistance of counsel should be denied.

[31] In that affidavit, which was executed nearly two (2) years after the murder, Whalen describes his interaction with the four (4) defendants shortly before they left Lavigne's apartment to commit the crime.  Whalen states:

> I told them not to go out on drugs with guns on them.  I do not remember how many guns where [sic] there.  Dwayne was drunk & on pills, like every one else.

contends that such evidence was relevant to the issue of specific intent during the guilt/innocence phase and to mitigation during the sentencing phase.[32]

The Fifth Circuit has held that there are three (3) essential components to a *Brady* claim: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued'." *Pierce v. Thaler*, 2009 WL 4572839, **4 (5th Cir. 2009), citing *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004)(quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Prejudice is established where there exists a "reasonable probability" that, had the evidence been disclosed, the result of the trial would have been different. *Id.* Again, a "'reasonable probability' of a different result is shown when the [state]'s evidentiary suppression 'undermines confidence in the outcome of the trial'." *Id.*, citing *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)(quoting *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

Even assuming Craig can establish that the evidence in question was favorable to

---

*See*, R. Doc. 1-6, p. 23. Whalen further attested:

> We all walked out side [sic] when, Dwayne told them <u>lets go</u>. Roy said, he wanted to stay there at the apt. with me, I told him, it would be nice but I had to go to work. At that time Dwayne pointed a gun at him and said to go get in the car. It got quite [sic] in there for a minute or two . . .

*Id.*

[32] Although Craig indicates in his habeas petition that, based upon his counsel's review of certain audiotapes produced by the State, "there are additional witnesses who may have information regarding Craig's condition and level of intoxication at the time of the crime," he has failed to specifically identify any of those witnesses or even generally state what their testimony might reveal. Accordingly, such unsupported contention does nothing to support his *Brady* claim.

him (in that it could have been used to discredit the testimony of Lavigne, Berthelot, and Yatter that Craig had not used drugs and alcohol on the night of the murder) and that the prosecution withheld that evidence either willfully or inadvertently, Craig's *Brady* claim nevertheless fails because he cannot demonstrate prejudice. As mentioned above, Craig's counsel cross-examined Berthelot, Lavigne, and Yatter on the issue of drug/alcohol use and abuse. Berthelot admitted to a history of using marijuana, LSD, pills, and cocaine on an experimental basis. He also admitted that he had sold marijuana in the past and that, at the time of his arrest for Gullet's murder, he had just tried to "start selling some pills." He even admitted that, on the night he was arrested, he was "extremely intoxicated" and had a number of pills in his possession, including Valium, Ripinols, Xanax, and some other types for which he could not recall their names. *See*, Trial transcript, pp. 5539-5541. Despite Berthelot's history of drug use, he denied that he had done any type of drugs or drank any alcohol on the day of the murder. *Id.*, p. 5538. On cross-examination, Lavigne also admitted that, in the past, he had used LSD, mushrooms, marijuana, cocaine, and pharmaceutical drugs, such as Valium, Ripinol, Xanax, and pain pills. He further confirmed that he had sold drugs on a few occasions. Lavigne, however, also denied that he had used drugs on the day of the murder.

Thus, it appears that, through cross-examination, defense counsel attempted to paint a picture of Berthelot and Lavigne as habitual drug users, to call their credibility into question, and to specifically cast doubt on their testimony that they (and Craig) had not used drugs or alcohol on the day of the murder. Despite such cross-examination testimony, the jury nevertheless obviously decided to believe the testimony of Berthelot and Lavigne concerning the events of the night in question, including the fact that they and

Craig had not used drugs/alcohol that night. The undersigned does not find it reasonably probable that such outcome would have been any different had the Whalen affidavit been disclosed by the prosecution and produced at trial. As the State notes in its opposition, even if Whalen would have been located and agreed to testify at trial, there is no way of knowing whether he would have "stuck to his story, or whether the jury would have believed him [over Berthelot, Lavigne, and Yatter],[33] or whether he would have wilted under cross examination." Furthermore, any benefit the affidavit of Whalen may have achieved on the drug/alcohol use issue would likely have been outweighed by the fact that the affidavit specifically identifies Craig as the leader of the group, who was directing his accomplices' actions while holding a gun in his hand, which is consistent with the testimony of Berthelot and Lavigne and with the State's theory of the case. In sum, it is not plausible to find that the failure to disclose the Whalen affidavit concerning the tangential matter of drug/alcohol use on the night in question undermined the reliability of all of the other consistent testimony regarding Craig's leadership role in the events of the night of the murder, which led to his guilty verdict.

---

[33] The case of *State v. Lindsey*, 98-1064 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, cited by Craig in his habeas petition, is distinguishable from this matter and does not persuade the Court that a *Brady* violation occurred in this case. In *Lindsey*, two of the State's witnesses who testified that the defendant was not intoxicated on the day of the shooting, had given prior statements to the police wherein they had related that the defendant was intoxicated when he shot the victim, and those statements had been withheld by the prosecution so defense counsel could not impeach those witnesses with their prior inconsistent statements to police. The Louisiana Fourth Circuit Court of Appeals therefore found that the defendant was entitled to an evidentiary hearing to determine whether a *Brady* violation had occurred. Subsequently, it was determined that the defendant had met his burden of proving that such a violation had been committed by the State. That case is distinguishable from the case at bar in that Berthelot and Lavigne never gave prior inconsistent statements concerning whether Craig was intoxicated on the day of the murder that could have been used to impeach them at trial and which were withheld by the State. Instead, the statement that was withheld was that of another individual, Whalen, who had far less interaction with Craig on the day of the murder than did Berthelot and Lavigne. Because Whalen's affidavit is not a prior inconsistent statement by Berthelot and Lavigne, it technically could not have been used to "impeach" those witnesses. It simply would have been one more item of evidence for the jury to consider, and the jury could have made a credibility call as to whom they wanted to believe on the issue of intoxication – Berthelot, Lavigne and Yatter or Whalen.

Finally, it is not reasonably probable that the information in Whalen's affidavit concerning drug use by Craig on the night of the murder would have caused the jury to conclude that Craig could not have formed the specific intent to kill Gullet. Even if the jury believed Whalen's testimony that Craig was intoxicated on the night of the murder, Craig has not produced any evidence indicating that the type of intoxication he was allegedly experiencing could have caused him to commit the murder of Gullet in the way that he did. He has not presented any evidence as to the type of drugs/alcohol he had consumed or any expert evidence demonstrating that a person taking those types of substances might exhibit the kind of violence and rage that Craig exhibited when he murdered Gullet. For example, many drugs cause users to experience states of euphoria, drowsiness, or hyper-alertness, none of which would have prevented Craig from forming the specific intent to kill.[34] Instead, the physical evidence and the unrefuted testimony of the State's witnesses suggest, beyond a reasonable doubt, that Craig had the specific intent to kill Gullet,

---

[34] Although Craig contends in a conclusory manner that his defense counsel "could have - but failed to - develop and present evidence regarding Craig's substance abuse and decreased liver function (resulting from an earlier injury), which increased his susceptibility to intoxication" to negate the element of specific intent, he has not presented any competent evidence to this Court substantiating his contention that he had an issue with substance abuse or decreased liver function at the time of the murder. Furthermore, he has not provided any expert evidence demonstrating that, if he had such conditions, those conditions would have impacted his consumption of alcohol/drugs in such a way as to cause him to lose his ability to form a specific intent to kill. *See, Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir. 1994)(Emphasis added); *Nelson v. Hargett,* 989 F.2d 847, 850 (5th Cir. 1993)(The Fifth Circuit has held that, in order to establish that counsel was ineffective due to a failure to investigate the case or to discover and present evidence, the petitioner must do more than merely allege a failure to investigate – he must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the evidence would have altered the outcome of the proceedings); *See, Rose v. Johnson*, 141 F.Supp.2d 661, 692 (S.D. Tex 2001), citing *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981)(In proving ineffective assistance of counsel, the petitioner must demonstrate that an alleged breach of his attorney's duty to investigate "resulted in an actual and substantial disadvantage to the course of his defense . . . The petitioner may not simply allege, but must "affirmatively prove," prejudice); *Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008). As such, this theory is entirely speculative, and without any evidence to support it, the undersigned cannot conclude that Craig's counsel was deficient in failing to investigate and pursue it at trial. Furthermore, even if such evidence had been discovered and presented by defense counsel and had established that Craig was unable to form specific intent at the time he killed Gullet, it is still reasonably probable that Craig would have been convicted of the lesser charge of second degree murder, for which he would be serving life in prison in any event.

regardless of whether his condition was impacted in some way by drugs or alcohol. The evidence, including Whalen's affidavit, indicates that Craig was the one that convinced his accomplices to go steal a car so he could go visit his girlfriend; that he was the one directing his accomplices around with a gun; that he was the one that suggested they kill Gullet, despite his accomplices' suggestions that they instead beat Gullet unconscious; that he was the one cruelly taunting Gullet while they were riding around in the vehicle for approximately an hour with Gullet pleading for his life at gunpoint; that he was the one that ultimately determined Gullet must be killed because one of his accomplices revealed Lavigne's identity; and that he was the one who directed and carried out the particularly brutal way in which Gullet was finally killed. Even if Craig was under the influence of drugs or alcohol at the time of the murder, such evidence nevertheless demonstrates that he was able to calculate, plan, and direct the series of events leading up to and culminating in Gullet's murder.[35] As such, it does not appear that an intoxicated or drugged condition precluded Craig from forming the specific criminal intent required for first degree murder.[36]

---

[35] The fact that evidence revealed that Craig returned to the vehicle following the murder with a shell casing to show off to his accomplices and that he, in essence, bragged about the event in that it proved to his friends that he was "hard" further suggests that Craig had the specific intent to kill Gullet in an attempt at demonstrating his toughness to his friends.

[36] *See,* La. R.S. 14:30 (which provides that "[f]irst degree murder is the killing of a human being . . . [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of . . . armed robbery, . . ."); La. R.S. 14:15 (which governs the defense of intoxication and provides that "[t]he fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except, . . . (2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime").

*See also, State v. Jordan*, 31,568 (La. App. 2 Cir. 2/24/99), 728 So.2d 954 (holding that the evidence produced at trial proved beyond a reasonable doubt that the defendant's drug use, voluntary or otherwise, neither caused him to commit the crime nor prevented him from having the specific intent to kill the victim. Nothing in the expert testimony suggested that the ingestion of two drinks, four muscle relaxants and the recent use of cocaine would cause a person to have an uncontrollable fit of murderous rage. Rather, the effects of the various mixtures of substances were described as producing states of

Accordingly, the state trial court's decision dismissing this claim was not contrary to or an unreasonable application of *Brady* or an unreasonable determination of the facts in light of the evidence, and this claim should also be dismissed.

### (C)     Claim No. 5 - *Napue* claim:

In his final claim, Craig contends that the Whalen affidavit, which the prosecution had in its possession, prior to Craig's trial, demonstrates that the State knowingly solicited perjured testimony from Berthelot and Lavigne that Craig had not used drugs and alcohol on the night of the murder in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).   In *Napue*, the U.S. Supreme Court held that, where a witness provides false testimony, known to be so by the prosecution, and the State does nothing to correct it, the defendant is denied due process.   *Id.*, at 269.   To succeed on a due process claim brought under *Napue*, a petitioner must show: "(1) [the witness] gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false." *Alix v. Quarterman*, 2009 WL 301844, **3 (5th Cir. 2009), quoting *May v. Collins*, 955 F.2d 299, 315 (5th Cir. 1992).

Craig has not demonstrated the three (3) elements required for his *Napue* claim. First, the undersigned has no way of knowing whether Berthelot's and Lavigne's testimony that Craig was not intoxicated on the night of the murder is false.   The fact that Whalen provided a conflicting statement in that regard does not establish that their testimony was false.   That is a credibility call that this Court is not capable of making, nor is it permitted

_____

either euphoria or drowsiness.  Neither state, even if the defendant suffered a blackout, would have prevented him from forming the specific intent to kill or inflict great bodily harm upon the victim.  Indeed, the physical evidence showing that the victim was both brutally strangled and viciously stabbed proves beyond a reasonable doubt that the defendant had the specific intent to kill the victim).

to do so on habeas review. Secondly, even assuming Whalen's affidavit established that Berthelot's and Lavigne's testimony concerning intoxication on the night of the murder was false, that falsity is not material to Craig's guilty verdict. As discussed in the previous section, in light of the plethora of other consistent testimony concerning Craig's leadership role in the events of the night of the murder, there is not a reasonable probability that false testimony by Lavigne and Berthelot regarding the tangential issue of drug/alcohol use would have changed the jury's guilty verdict.[37]

Finally, Craig has not produced any evidence demonstrating that the prosecution knew that Lavigne's and Berthelot's testimony concerning drug/alcohol use on the night of the murder was false. Again, the mere fact that Whalen's testimony in that regard is conflicting does not mean that, upon receiving Whalen's affidavit, the prosecution had knowledge that Lavigne's and Berthelot's testimony was false, particularly considering the fact that another witness, Yatter, also testified that Craig did not appear to be under the influence of drugs or alcohol on the night in question and in light of the fact that Lavigne's and Berthelot's other testimony about the events of the night was consistent with that of Yatter. If it was a matter of choosing whose testimony was more likely truthful, it is probable that the prosecution believed the stories of Lavigne, Berthelot, and Yatter because they were either present during the crime or heard about the crime from Craig immediately thereafter. By contrast, Whalen only saw Craig and his accomplices for a short period

---

[37] As the State succinctly put it, "[h]ad the jury heard that drugs were involved (contrary to what every witness said), there is no reason to think the jury would have ignored the witnesses' vivid descriptions of Craig's cold, cruel, and callous torment and murder of Kipp Gullet (not to mention the physical evidence linking Craig to the crime). Besides the jury heard – and apparently ignored– defense counsel's repeated attempts to discredit the witnesses as long-time drug abusers and petty dealers. Drugs were a side-show in Craig's trial, and thus any false testimony on that issue could not have affected the outcome." *See*, State's Memorandum in Support of Answer, R. Doc. 15-1, p. 29.

before they left to go to Kirby Smith dorm parking lot (which was at least an hour before the murder was committed since testimony indicated that they drove Gullet around in his Bronco for approximately an hour debating his fate); furthermore, Whalen's affidavit was not executed until nearly two (2) years after the murder. Under the circumstances, Craig has completely failed to demonstrate that the State knowingly presented false testimony by Lavigne and Berthelot, and the state trial court's decision dismissing this claim was not contrary to or an unreasonable application of *Napue*. This claim should therefore also be dismissed.[38]

### III. Craig's request for an evidentiary hearing:

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. §2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Richards v. Quarterman*, 566 F.3d 553, 562-63 (5th Cir. 2009), quoting *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). "In determining whether to grant a hearing, under Rule 8(a) of the habeas Court Rules 'the judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted'." *Id.* In making that determination, courts must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* "Because the deferential standards prescribed by §2254 control whether to grant habeas relief, a federal court must take into account

---

[38] The undersigned notes that, even if the *de novo* standard of review was applicable herein for the reasons articulated by Craig in his reply memorandum, habeas relief would nevertheless be denied as to all of Craig's claims for the reasons stated above. *See, Noble v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997)(declining to determine whether the state habeas court sufficiently adjudicated the petitioner's claim on the merits because the petitioner's claim failed "even applying the pre-AEDPA *de novo* standard of review).

those standards in deciding whether an evidentiary hearing is appropriate." *Id.* "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Since the undersigned has been able to determine, based upon a review of the parties' briefs and the state court record, that Craig's factual allegations are either procedurally barred or refuted and that he is not entitled to habeas relief, an evidentiary hearing is not necessary in this matter.

## <u>RECOMMENDATION</u>

For the above reasons, it is recommended that the Petition for Writ of Habeas Corpus (R. Doc. 1) filed by petitioner, Dale Dwayne Craig, should be **DISMISSED WITH PREJUDICE**.

Signed in chambers in Baton Rouge, Louisiana, July 21, 2011.

_____

**MAGISTRATE JUDGE CHRISTINE NOLAND**